## UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

NAPERVILLE SMART METER AWARENESS, )
an Illinois not-for-profit corporation, MARGARET )
MARY WOOD, SCOTT J. DERENGOWSKI, )
KIMBERLEY WELLS HAMILTON, JO MALIK, )
JENNIFER STAHL, TOM GLASS, KIM BENDIS, )
GLENN A. MENDOZA, and AMANDA RYKOV, )    Case No. 11-cv-9299
       )
       Plaintiffs,      )    Honorable John Z. Lee
       )
v.       )
       )
CITY OF NAPERVILLE,      )
       )
       Defendant.     )

---

## PLAINTIFFS' BRIEF PURSUANT TO COURT
## ORDER OF SEPTEMBER 21, 2012

Doug E. Ibendahl
165 N. Canal Street, Suite 1215
Chicago, Illinois 60606-1404
Telephone: (312) 648-0061
Email: dibendahl@mail.com
ARDC Attorney No. 6229474

*Attorney for Plaintiffs*

October 5, 2012

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ iii

ARGUMENT ...................................................................................................................... 1

I.  DEFENDANT'S ACTIONS CAUSED AN ACTIONABLE SECTION 1983 CLAIM
    UNDER THE FOURTEENTH AMENDMENT ................................................... 1

    A.  The Right to Bodily Integrity and Self-Determination ............................... 1

    B.  Defendant Denied Plaintiffs Any and All Access to Due Process ............. 3

        1.  Defendant Failed to Conduct a Public Hearing Prior to the Implementation of its
            Smart Meter Program as Required by Federal Law ............................ 3

        2.  Defendant Initiated and Spearheaded Legal Challenge to Proposed Advisory
            Referendum .......................................................................................... 4

        3.  Defendant's Have Never Sought Customer Consent for Smart Meter Installation 4

II. DEFENDANT'S COLLECTION OF INFORMATION VIA SMART METERS IS AN
    UNREASONABLE SEARCH UNDER THE FOURTH AMENDMENT EVEN
    ASSUMING *ARGUENDO* THAT DEFENDANT ONLY COLLECTS ............... 5

    A.  Defendant's Partner in the Subject Project Recognizes Significant Change .............. 5

    B.  Smart Meters and the "Long View" of the Fourth Amendment ................. 6

    C.  State Action Prong is Satisfied ................................................................. 7

    D.  Citizens have a reasonable expectation of privacy in smart meter data ...................... 8

III. PLAINTIFFS HAD NO MEANINGFUL ADMINISTRATIVE REMEDIES AVAILABLE
     TO THEM WITH RESPECT TO THEIR FIFTH AMENDMENT TAKINGS CLAIM ...... 12

IV. DEFENDANT'S OWN DOCUMENTS REFUTE DEFENDANT'S CLAIMS OF SMART
    METER NON-INVASIVENESS ...................................................................... 13

CONCLUSION ................................................................................................................ 15

# TABLE OF AUTHORITIES

**Cases**

*Chambers v. Baltimore & Ohio Railroad*, 207 U.S. 142 (1907) .................................................. 2

*Cleveland Bd. of Educ. V. Loudermill* .................................................................................. 3

*Hurtado v. People of California*, 110 U.S. 516 (1884) ........................................................ 2

*In re: Cincinnati Radiation Litigation*, 874 F.Supp. 796 (S.D. Ohio 1995) .......................... 2

*Ingraham v. Wright*, 430 U.S. 651 (1977) ........................................................................ 3

*Kyllo v. United States*, 533 U.S. 27 (2001) .......................................................... 7, 9, 10

*Meyer v. Nebraska*, 262 U.S. 390 (1923) ......................................................................... 2

*Minnesota v. Carter*, 525 U.S. 83 (1998) ......................................................................... 9

*Monell v. New York City Dept. of Social Services*, 436 U.S. 658 (1978) ............................... 1

*Payton v. New York*, 445 U.S. 573 (1980) ........................................................................ 9

*Pierce v. Society of Sisters*, 268 U.S. 510 (1925) ............................................................. 2

*Prince v. Massachusetts*, 321 U.S. 158 (1944) ................................................................. 2

*Roe v. Wade*, 410 U.S. 113 (1973) ................................................................................. 2

*Silverman v. United States*, 365 U.S. 505 (1961) .............................................................. 9

*Skinner v. Oklahoma*, 316 U.S. 535 (1942) ...................................................................... 2

*Smith v. Maryland*, 442 U.S. 735 (1979) ................................................................... 7, 11

*Union Pacific R. Co. v. Botsford*, 141 U.S. 250 (1891) ...................................................... 2

*United States v. Cuevas-Perez*, 640 F.3d 272 (7th Cir. 2011) ........................................... 11

*United States v. Garcia*, 474 F.3d 994 (7th Cir. 2007), *reh'g and suggestion for reh'g en banc denied*, No. 06-2741, 2007 U.S. App. LEXIS 8397 (7th Cir. Mar. 29, 2007) .......................... 6

*United States v. Hamilton*, 434 F.Supp.2d 974 (D.Or., 2006) .......................................... 8, 9

*United States v. Jones*, 132 S.Ct. 945 (2012) .................................................................. 8

*United States v. McIntyre*, 646 F.3d 1107 (8th Cir. 2011) ........................................................... 8

*United States v. Miller*, 425 U.S. 435 (1976) ............................................................................. 7

*United States v. Warshak*, 631 F.3d 266 (6th Cir. 2010) .......................................................... 12

*United States v. White*, 401 U.S. 745 (1971) ............................................................................ 6

*United States v. Willis*, 759 F.2d 1486 (11th Cir. 1985) ........................................................... 7

**Statutes**

42 U.S.C. § 1983 ............................................................................................................................ 1

Freedom of Information Act, 5 ILCS 140/1 *et seq.* ................................................................... 13

Public Utilities Regulatory Policies Act of 1978 ("PURPA")(16 U.S.C. 2621(d)) ...................... 3

## ARGUMENT

### I.   DEFENDANT'S ACTIONS CAUSED AN ACTIONABLE SECTION 1983 CLAIM UNDER THE FOURTEENTH AMENDMENT

The Fourteenth Amendment provides that no State shall "deprive any person of life, liberty, or property without due process of law." Defendant's actions caused such an actionable deprivation in this case. Further, a local governing body, such as Defendant, can be sued directly under 42 U.S.C. § 1983 for monetary, declaratory, or injunctive relief in those situations where, as here, the action that is alleged to be unconstitutional "implements or executes a policy statement, ordinance, regulation, or decision officially adopted or promulgated by those whose edicts or acts may fairly be said to represent official policy." *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 690-91 (1978).

#### A.   The Right to Bodily Integrity and Self-Determination

Count II of Plaintiffs' First Amended Complaint for Injunctive Relief cites Plaintiffs' valuable interest in their own health, privacy, and safety – as well as with respect to their families. Am. Compl. ¶ 130. One of the primary objections all of the Plaintiffs have regarding the forced installation of smart meters is based on the harmful impact to the body caused by continual exposure to the radio frequency ("RF") transmissions upon which smart meters and the entire smart grid "mesh" network rely.[1] Since the Plaintiffs' initiation of this litigation, concerns over the negative health consequences of smart meters have only continued to grow worldwide.

Plaintiffs have the right to reject an unproven, invasive technology which an increasing number of medical professionals around the world have deemed excessively risky or unsafe.[2]

---

[1] In response to Plaintiffs' recent Interrogatory, Defendant admits it has never and will never guarantee the absolute health, privacy and security of its customers as a result of smart meter devices installed by Defendant at customer residences. (Dkt. No. 45, p. 2.)

[2] "Health Experts from 20 Countries Caution About Smart Meter Risks," *The Wall Street Journal*, Sep. 25, 2012 ("Children may particularly be at risk of developing electromagnetic hypersensitivity or diseases such as cancer from overexposure to radiofrequency(RF)/microwaves emitted by smart meters and other wireless devices, say 54 experts who have authored hundreds of peer-reviewed studies on the health effects of electromagnetic fields...")

This right to reject is grounded in fundamental rights of personal self-determination and bodily integrity – the right to be left alone. The constitutional right to be free from unwanted bodily intrusions has been recognized for over a century. As early as 1884, the Supreme Court recognized that the Fourteenth Amendment protects the integrity of one's body. *Hurtado v. People of California*, 110 U.S. 516 (1884); (see also, *Union Pacific Railroad v. Botsford*, 141 U.S. 250, 251 (1891)("No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others."); *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923)(The Fourteenth Amendment encompasses "not merely freedom from bodily restraint," but "to engage in any of the common occupations of life . . . and enjoy the privileges long recognized at common law as essential to the orderly pursuit of happiness by free men."); *Skinner v. Oklahoma*, 316 U.S. 535 (1942)(Sterilization performed without consent deprived the individual of a "basic liberty").

The U.S. Constitution mandates that any deliberate invasion of bodily integrity must comply with formalized procedural regularity, within the boundaries of Due Process. *In re: Cincinnati Radiation Litigation*, 874 F.Supp. 796 (S.D. Ohio 1995). The right of access to courts to redress such grievances and enforce rights is also basic to our system of government, and is protected by the Constitution. *Chambers v. Baltimore & Ohio Railroad*, 207 U.S. 142 (1907). Similarly, "[t]he Constitution does not explicitly mention any right of privacy. In a line of decisions, however, going back perhaps as far as *Union Pacific R. Co. v. Botsford*, 141 U.S. 250, 251 (1891), the Court has recognized that a right of personal privacy, or a guarantee of certain areas or zones of privacy, does exist under the Constitution." *Roe v. Wade*, 410 U.S. 113, 152 (1973)(see also, *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944)(family relationships); *Pierce v. Society of Sisters*, 268 U.S. 510, 535 (1925)(child rearing and education).

2

Therefore, in addition to Plaintiffs' rights under the Fourth Amendment and Fifth Amendment as discussed later in this brief, Plaintiffs' health, safety, privacy, and security, as those elements are encompassed overall by Plaintiffs' liberty interest in their bodily integrity – is most certainly a constitutionally protected interest deserving of procedural safeguards. Generally, due process requires some notice and an opportunity to be heard prior to the deprivation of a protected interest. *Cleveland Bd. of Educ. V. Loudermill*, 470 U.S. 532, 542 (1985); (See also, *Ingraham v. Wright*, 430 U.S. 651, 673-74 (1977)(Schoolchilderen have a liberty interest in their bodily integrity that is protected by the due process clause against deprivation by the state.).

**B.      Defendant Denied Plaintiffs Any and All Access to Due Process**

Defendant had at least three opportunities where it could have afforded Plaintiffs at least some semblance of due process prior to the deprivation of Plaintiffs' constitutional rights. Not only did Defendant fail to avail itself of these opportunities, in each case Defendant proactively worked to ensure that no procedural protections would be available to Plaintiffs.

**1.      Defendant Failed to Conduct a Public Hearing Prior to the Implementation of its Smart Meter Program as Required by Federal Law**

The Public Utilities Regulatory Policies Act of 1978 ("PURPA")(16 U.S.C. 2621(d)) required Defendant to provide notice and conduct a public hearing prior to the formal implementation of the subject smart meter program. (*See,* Plaintiffs' Brief in Opposition to Defendant's Motion to Dismiss and Reply in Support of Plaintiffs' Motion for Preliminary Injunction, at 6-9.) Defendant did not conduct the required hearing. However, Defendant has provided this Court with two conflicting and mutually exclusive accounts of the issue.

"The City has not conducted a proceeding regarding the [Energy Policy Act] standards contained in Sections 2621(d)(14)(A) and Section 2621(d)(14)(C) and has no obligation to do so." (Emphasis added.) (Dkt. No. 23, p. 8.)

"The City has conducted a proceeding regarding the [Energy Policy Act] standards contained in Sections 2621(d)(14)(A) and Section 2621(d)(14)(C) and therefore Plaintiffs can not allege that they have been denied the right to participate in such a proceeding." (Emphasis added.) (Dkt. No. 30, p. 3.)

3

### 2. Defendant Initiated and Spearheaded Legal Challenge to Proposed Smart Meter Advisory Referendum

Plaintiffs have previously detailed their efforts to place an advisory referendum regarding smart meters on the March 20, 2012, General Primary Election ballot within the City of Naperville. (Dkt. No. 28, p. 22.) There is one update. By letter of July 23, 2012, the Office of the Attorney General of Illinois concluded its investigation into the petition objection hearings conducted by Defendant's electoral board in January of this year. The Attorney General cited Defendant in violation of three separate sections of the Illinois Open Meetings Act with respect to the conduct of the January electoral board hearings.

### 3. Defendant's Have Never Sought Customer Consent for Smart Meter Installation

Defendant has never sought consent with respect to smart meter installation, and has chosen instead to force the invasive and harmful devices upon its customers. Defendant's stated position is that customers "consented" when they signed up for electrical service. This absurd view of course ignores the fact that in some cases a customer's "consent" may have been provided decades ago, and in almost no case is a customer providing informed consent that would take into account the fundamentally different nature of smart meters verses the pre-existing analog devices. Defendant also of course wishes to ignore the monopoly power it exercises in any contracting relationship with a customer, as well as the adhesion nature of a contract for a necessity such as electrical power service.

Additionally, in response to Plaintiffs' recent Interrogatory requesting that Defendant "[s]pecify the manner (including the dates(s)) in which you caused documents and/or communications addressing the health, safety, security, and privacy related risks associated with smart meters to be disseminated to Defendant's electric customers prior to your approval of NSGI," Defendant answered in pertinent part, "that it had no legal obligation to provide any information addressing health, safety, security, and privacy risks."

4

II. **DEFENDANT'S COLLECTION OF INFORMATION VIA SMART METERS IS AN UNREASONABLE SEARCH UNDER THE FOURTH AMENDMENT EVEN ASSUMING *ARGUENDO* DEFENDANT ONLY COLLECTS "AGGREGATE POWER CONSUMPTION INFORMATION" ON A 15 MINUTE BASIS**

Defendant's disingenuous suggestion that its new meters will only provide the Defendant with substantially the same information as older or existing meters, truly begs the question as to why then rush forward with a very expensive and unproven smart meter project. Defendant cannot have it both ways. Defendant has engaged in a long and expensive marketing campaign extolling the purported virtues of smart meters. At the heart of Defendant's sales pitch is the promise that customers will be able to monitor their electric usage at any time during the day and adjust their usage accordingly in order to take advantage of purported lower rates which may apply during off-peak hours. As Defendant has repeatedly extolled detailed usage information as a main selling point for smart meters, Defendant cannot now pretend it is oblivious to the surveillance capabilities of smart meters. Defendant simply cannot deny that electricity consumption patterns generated from an advanced metering infrastructure reveals variation in power consumption that can in fact be associated with various household activities – for example, personal sleep, work, and travel habits. Further, as a largely unregulated municipal owned utility, and based upon past experience, there is no reason to hope that Defendant won't simply internally adjust transmission parameters at any time in the future as it sees fit.

A. **Defendant's Partner in the Subject Project Recognizes Significant Change**

The U.S. Department of Energy ("DOE") has been very open in discussing the fundamental change in data collection which smart meters represent.[3] Another expert, the

---

[3] U.S. Department of Energy, *Data Access and Privacy Issues Related to Smart Grid Technologies*, Oct. 5, 2010, at 2 ("Advances in Smart Grid technology could significantly increase the amount of potentially available information about personal energy consumption. Such information could revel personal details about the lives of consumers, such as their daily schedules (including times when they are at or away from home or asleep), whether their homes are equipped with alarm systems, whether they own expensive electronic equipment such as plasma TVs, and whether they use certain types of medical equipment.").

Congressional Research Service ("CRS"), has also weighed in extensively and similarly on the capabilities of smart meters under normal usage conditions. (Dkt. No.18, Ex. B.)

The CRS also assumed a 15 minute transmission interval which is arguably something of an industry standard at present. But the key observation is that, according to CRS, such 15 minute interval in the case of a smart meter operating under normal conditions, still necessarily provides substantially different information which is far more detailed than a utility currently . receives from a customer's analog meter. *Id.*

There can be no denying for example that a utility receiving power usage data in near real-time (every 15 minutes) can, at a minimum, determine when a home is occupied, when the occupant(s) is asleep, as well as when the resident leaves or arrives home.

### B.     Smart Meters and the "Long View" of the Fourth Amendment

As Judge Posner has explained, "the Supreme Court has insisted, ever since *Katz v. United States*, that the meaning of a Fourth Amendment search must change to keep pace with the march of science." *United States v. Garcia*, 474 F.3d 994, 997 (7th Cir. 2007), *reh'g and suggestion for reh'g en banc denied*, No. 06-2741, 2007 U.S. App. LEXIS 8397 (7th Cir. Mar. 29, 2007);(See also, *United States v. White*, 401 U.S. 745, 786 (1971)("The critical question, therefore, is whether under our system of government, as reflected in the Constitution, we should impose on our citizens, the risks of the electronic listener or observer without at least the protection of a warrant requirement.")(Harlan, J., dissenting).

As explained above it is Plaintiffs' position that Defendant's current installation and use of smart meters constitutes an unreasonable search under the Fourth Amendment, regardless of the manner in which Defendant may seek to characterize or downplay the near real-time personal information being harvested by the new devices. Obviously as the level of detail increases (for example if the Defendant switched from a 15 minute interval to a 5 minute interval), the Fourth Amendment violation only becomes more severe and apparent. Similarly, Plaintiffs respectfully

6

suggest that this Court's analysis under the Fourth Amendment cannot be performed on a static basis. Smart meters represent a new and emerging technology, one whose capabilities can only be expected to increase rapidly, if not exponentially. This case argues for application of the "long view" on the Fourth Amendment which Justice Scalia advocated in *Kyllo v. United States*, 533 U.S. 27, 40 (2001).

### C.     State Action Prong is Satisfied

Defendant is certainly a government actor. The subject case is relatively unique in that Defendant, a municipality, is the utility. The third-party doctrine for example does not even come into play. Cases which have considered records or information turned over by a business to government authorities (see e.g., *Smith v. Maryland*, 442 U.S. 735 (1979)(telephone records); *United States v. Miller*, 425 U.S. 435 (1976)(bank records); *United States v. Willis*, 759 F.2d 1486 (11th Cir. 1985)(motel registration records)) are inapplicable to the instant case where the utility and law enforcement are one and the same.

The need for heightened scrutiny under the Fourth Amendment is warranted in this case because not only are the utility and the police force consolidated into the same governmental entity, but there is nothing in the record to suggest that any type of meaningful or enforceable internal separation exists between Defendant's utility function and its police function. In fact a police detective employed by Defendant made recent public comments clearly anticipating the great help smart meter information would be to his police investigatory work. (Dkt. No. 39, p. 2.) And Defendant's police force is already directly involved with the forced installation of smart meters.[4]

"Awareness that the Government may be watching chills associational and expressive freedoms. And the Government's unrestrained power to assemble data that reveal private aspects

---

[4] "Naperville begins smart meter installation," *TribLocal*, Jan. 4, 2012,
    http://triblocal.com/naperville/2012/01/04/naperville-begins-smart-meter-installation/.

of identity is susceptible to abuse." *United States v. Jones*, 132 S.Ct. 945, 956 (2012)(Sotomayor, J., concurring). Further, even if internal policies or guidelines existed regarding separation of police and utility functions, the Fourth Amendment concern is the same in light of the absolute absence of transparency and lack of any meaningful means for a citizen to seek enforcement of an internal policy. The commonality of oversight over both the utility and police force by the same senior officials (e.g., the city council and mayor) is an additional source of concern. The Defendant's smart meter program as it is currently being implemented, without meaningful notice or true consent, can reasonably be expected to regularly implicate the Fourth Amendment. But perhaps the real question is, how will citizens even know? When the police and the utility "serve the same masters" and have equal access to the same internal resources and information, the potential for abuse is clear. The Defendant would prefer a standard whereby no Fourth Amendment violation would ever be identified until long after an arrest was made, and quite possibly not even then. Defendant could of course resolve all of these issues by simply seeking informed consent from the resident prior to the installation of a smart meter, but thus far Defendant has refused to even consider that reasonable remedy.

**D.      Citizens have a reasonable expectation of privacy in smart meter data**

It is no surprise that Defendant has never seriously addressed the recent case law in the Fourth Amendment arena dealing with the great advances in technology. Defendant has instead merely cited cases such as *United States v. McIntyre*, 646 F.3d 1107 (8th Cir. 2011), a case which is not only inapplicable because it relied upon the third-party doctrine, but the power consumption records at issue were not generated by a smart meter and were instead basic consumption records generated solely for billing purposes by an analog meter. *Id* at 1111.

Similarly, *United States v. Hamilton*, 434 F.Supp.2d 974 (D.Or., 2006) is unhelpful because it also relied upon the third-party doctrine, and also involved basic utility bill records generated via a traditional meter. *Id.* at 977. In finding no reasonable expectation of privacy in

8

the utility records, the court relied on the individual's voluntary conveyance of his power usage information to his electric company, which law enforcement later obtained by subpoena. *Id.* at 980. Such facts are clearly distinguishable from the instant case where there is no "third party," and where the lack of consent with respect to smart meters coupled with forced, involuntary installation, is at the core of Plaintiffs' case.

The two cases most on point, *Kyllo v. United States*, 533 U.S. 27 (2001) and *United States v. Jones*, 132 S.Ct. 945 (2012), are of course the two cases which Defendant has thus far avoided. *Kyllo* and *Jones* are most instructive as they consider advances in technology not dissimilar from the instant case and apply the facts under the Fourth Amendment. The relatively unique nature of Defendant (a combined utility and police force), coupled with the significantly more detailed information gleaned by smart meters, makes this case fundamentally different from prior federal cases where utility bills were at issue.

When analyzing the Fourth Amendment, the Supreme Court has consistently treated the home as special, if not sacred. See e.g., *Payton v. New York*, 445 U.S. 573, 589 (1980); *Minnesota v. Carter*, 525 U.S. 83, 99 (1998). "In the home, our cases show, *all* details are intimate details, because the entire area is held safe from prying government eyes." *Kyllo*, 533 U.S. at 35. And "[a]t the very core" of the Fourth Amendment "stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." *Silverman v. United States*, 365 U.S. 505, 511 (1961).

"It would be foolish to contend that the degree of privacy secured to citizens by the Fourth Amendment has been entirely unaffected by the advance of technology." *Kyllo*, 533 U.S. at 34. In *Kyllo* the Court ruled that the use of a thermal-imaging device aimed at a private home from a public street to detect relative amounts of heat within the home constituted a "search" within the meaning of the Fourth Amendment. *Id.* at 40. Based on heat readings, a law enforcement agent had concluded that petitioner was using specialized lights to grow marijuana

9

in his house, which indeed he was. *Id.* at 37. The Court reasoned, "[w]hile the technology used in the present case was relatively crude, the rule we adopt must take account of more sophisticated systems that are already in use or in development." *Id.* at 36. "Where, as here, the Government uses a device that is not in general public use, to explore details of the home that would previously have been unknowable without physical intrusion, the surveillance is a 'search' and is presumptively unreasonable without a warrant." *Id.* at 40. All of the factors relied upon by the Court in *Kyllo* are present in the instant case. The data generated by smart meter technology has much more in common with the infrared sensing devices in *Kyllo* than with traditional utility records. Further, the devices would obviously not be gathering the detailed data from inside the home, but for the forced physical intrusion by Defendant, a municipal government. And not only do smart meters remain a new technology - where they have been installed in other parts of the country, customer backlash and dissatisfaction has forced utility to offer expanded opt-out rights. In any case, smart meter installation in America remains far short of the point where it could be persuasively argued the devices are "in general public use."

In *Jones*, the Court considered a further advance in technology in yet another drug related case – and this time issued a ruling which extended far beyond the home. In *Jones* the Court held that a government's installation of a GPS device on a target's vehicle and the use of that device to monitor the vehicle's movements, constituted a "search" under the Fourth Amendment. *Jones*, 132 S.Ct. at 953.

Justice Scalia writing for the majority in *Kyllo* provided a quaint example to illustrate the invasive capabilities of the thermal-imaging device utilized by law enforcement in that case, "[t]he Agema Thermovision 210 might disclose, for example, at what hour each night the lady of the house takes her daily sauna and bath – a detail that many would consider 'intimate', and a much more sophisticated system might detect nothing more intimate than the fact that someone left a closet light on." *Kyllo*, 533 U.S. at 38.

10

The smart meters at issue in the instant case truly are capable of revealing the kind of intimate details Scalia mentioned. If anything, smart meters are much more invasive than the relatively crude thermal-imager at issue in *Kyllo*. More importantly, smart meters harvest information from inside the home as opposed to the outdoor surveillance which the Court deemed a "search" within the meaning of the Fourth Amendment in *Kyllo*. Justice Sotomayor writing in her concurrence in *Jones* observed, "[p]erhaps, as Justice Alito notes, some people may find the 'tradeoff' of privacy for convenience 'worthwhile,' or come to accept this 'diminution of privacy' as 'inevitable,' and perhaps not. I for one doubt that people would accept without complaint the warrantless disclosure to the Government of a list of every Web site they had visited in the last week, or month, or year." *Jones*, 132 S.Ct. at 957 (Sotomayor, J., concurring)(See also *United States v. Cuevas-Perez*, 640 F.3d 272, 286 (7th Cir. 2011) (Wood, J., dissenting)("The technological devices available for [monitoring a person's movements] have rapidly attained a degree of accuracy that would have been unimaginable to an earlier generation. They make the system that George Orwell depicted in his famous novel, *1984*, seem clumsy and easily avoidable by comparison.").

In the instant case, many of Defendant's electric customers would be very surprised to learn that their municipal officials can easily determine whether they are home or away at any given time during the day. And it is hardly a defense for Defendant to rely upon a lack of informed consent. Customers have a reasonable expectation of privacy in the detailed power usage information at issue, and that expectation is one society would recognize as reasonable.

The Court in *Kyllo* applied the principle that a Fourth Amendment search does *not* occur (even when a house is concerned), unless "the individual manifested a subjective expectation of privacy in the object of the challenged search," and "society [is] willing to recognize that expectation as reasonable." *Kyllo*, 533 U.S. at 39 (citing *California v. Ciraolo*, 476 U.S. 207, 211 (1986))(see also, *Jones*, 132 S.Ct. at 955; *Smith v. Maryland*, 442 U.S. 735, 740-41 (1979); *Katz*

11

*v. United States*, 389 U.S. 347, 361 (1967)(Harlan, J., concurring); *United States v. Warshak*, 631 F.3d 266, 286 (6th Cir. 2010)). In finding that a "search" had occurred, the Court in *Kyllo* also acknowledged, [w]hile it is certainly possible to conclude from the videotape of the thermal imaging that occurred in this case that no 'significant' compromise of the homeowner's privacy has occurred, we must take the long view, from the original meaning of the Fourth Amendment forward." *Kyllo*, 533 U.S. at 40 (Emphasis added).

Perhaps no case argues for taking "the long view" more than the one at hand. In the instant case we have new, advanced technology in the hands of a municipal government which also has its own police force. The smart meters in question are capable of gleaning personal information from customers which at least one member of that police force is publicly anxious to utilize. When these facts are considered in total, coupled with the lack of informed consent, a "search" occurs in violation of the Fourth Amendment.

## III.   PLAINTIFFS HAD NO MEANINGFUL ADMINISTRATIVE REMEDIES AVAILABLE TO THEM WITH RESPECT TO THEIR FIFTH AMENDMENT TAKINGS CLAIM

Defendant is implementing its smart meter rollout pursuant to legislation (Municipal Code) and to Plaintiffs' knowledge there exists no administrative procedure within the municipality's government whereby Plaintiffs might seek relief with respect to their Fifth Amendment takings claim. Further, as a municipal owned utility the Defendant is not subject to regulation by the Illinois Commerce Commission and therefore Plaintiffs are left without an avenue to seek state regulatory assistance. Defendant's city council (comprised of eight councilmen and a mayor), in addition to its other duties (including all approvals authorizing the subject smart grid/smart meter project), also functions as the only approximation to a regulatory body overseeing the Defendant's utility operation. While no Plaintiff has sought administrative relief specifically with respect to their Fifth Amendment takings claim internally with Defendant, it can be noted that multiple Plaintiffs have attended nearly every meeting of Defendant's city

12

council for approaching two years, in order to ask questions and voice concerns about various

aspects of smart meters and the Defendant's forced implementation project.

## IV.    DEFENDANT'S OWN DOCUMENTS REFUTE DEFENDANT'S CLAIMS OF SMART METER NON-INVASIVENESS

While discovery is still ongoing, prior to filing their complaint Plaintiffs worked

diligently for over a year to obtain documents from Defendant through the Freedom of

Information Act, 5 ILCS 140/1 *et seq.* ("FOIA"). Information received in answer to these FOIA

requests has sometimes conflicted with representations made by Defendant during the course of

this litigation.

The smart meter utilized by Defendant is capable of recording the amount of electricity

used (Interval Electric Usage Data) on 15-minute, 30-minute, and 60-minute intervals, as well as

the date and time of each event in the interval data records. Defendant states it has chosen the

most frequent setting (15-minute). The frequency, format, content, storage, and retrieval of

electricity consumption data has changed considerably as compared to the analog meter system.

For example, Defendant's electric consumption data record has shifted from a record of one data

point reflecting average monthly usage to a record of approximately 3,000 distinct and time-

stamped data points per month that reflect actual energy use.

Interval Electric Usage Data recorded from smart meters is, according to Defendant's

own publication, "critical for optional energy programs and billing choices that the utility may

offer to customers, such as time-of-use electric rates and demand-response programs.[5]

Defendant's senior electrical engineer Cyrus Ashrafi confirmed the use of 15 minute

interval information for more than strictly billing purposes. (*Transcript of Proceedings Before

the Honorable John Z. Lee*, Sep. 21, 2012 at page 15, lines 304 (Attached hereto as Exhibit A.)

"With respect to the demand response, it uses the same aggregate 15 minute interval

---

[5]  City of Naperville, *Customer Privacy and Advocacy Handbook*, at 3,
    http://www.naperville.il.us/emplibrary/Smart_Grid/NSGI-CPAHandbook.pdf.

information.") However, Defendant's counsel Margo Ely stated during those same proceedings that the information that would provide the basis for the demand-response program would never be collected by the Defendant, adding "[i]t is information that if you get the ePortal, that will be able to be provided in your own home." *Id.* at page 10, lines 9-10. In truth, the ePortal is a secure proprietary website provided and hosted by Defendant where its electric customers can view their "Interval Electric Usage Data in near real-time" using a "personal login and password" and which personal energy usage information will be accessible (and exportable) from Defendant via the ePortal for three years.[6] It is implausible that Defendant, the entity that maintains the ePortal, will not be collecting and have easy access to the same information Defendant promises to make available to its electric customers.

The term "aggregate energy consumption data" Defendant repeatedly referenced before this Court does not appear anywhere in Defendant's Municipal Code. Plaintiffs did find a reference to the term in one of Defendant's publications where it describes "aggregate energy consumption data" that is sent to third parties.[7] This contradicts Defendant's assertion to this Court that the only government department or entity it shares aggregate energy consumption data with is its finance department for billing purposes only. (*Transcript of Proceedings Before the Honorable John Z. Lee*, Sep. 21, 2012 at page 16, lines 14-25, page 17, lines 1-8. According to one of Defendant's own publications, Defendant shares its aggregate energy consumption data with the Illinois Municipal Electric Agency, Federal Energy Regulatory Commission, North America Electric Reliability Corporation, DOE, Regional Transmission Operators Demand Sharing Programs, consultants involved in studying electric usage to set utility rates, and students and researchers.[8]

---

[6] *Id.* at 7-8.

[7] *Id.* at 6.

[8] *Id.*

Defendant's own publication states:

- Defendant's detailed energy usage will be used not only for billing purposes, but network monitoring and network operations.[9]
- Defendant is researching the ability to transmit water and gas meter reads.[10]
- Defendant will have access to the raw data on its servers which will be used for billing and network operations.[11]
- Installing monitoring stations that "aggregate data from a development instead of collecting data from the end user" was because the aggregate information would not allow Defendant to offer its customers programs like demand response.[12]

Further, this case is not just about how often a customer's smart meter communicates with the utility regarding that customer's own energy usage. Rather, it is important to remember that each customer's smart meter is communicating on a much more frequent (if not constant) basis with other meters in the network (acting as a relay) that could have up to 881 daily transmittals. This is the "mesh" aspect of smart metering.[13]

## CONCLUSION

For all of the reasons set forth herein and as previously specified, Plaintiffs respectfully renew their request for the preliminary injunctive relief as set forth in Plaintiffs' Motion for Preliminary Injunction.

Respectfully submitted,

By:  s/ Doug E. Ibendahl
      Doug E. Ibendahl, ARDC No.: 6229474
      165 N. Canal Street, Suite 1215
      Chicago, Illinois 60606-1404
      Tel: 312-648-0061
      Email: dibendahl@mail.com
      ATTORNEY FOR PLAINTIFFS

---

[9] City of Naperville, NSGI *Question/Response Inventory*, Feb. 17, 2012, 24-25, *available at* http://www.docstoc.com/docs/114796729/NSGI-QRI.

[10] *Id.* at 28.

[11] *Id.* at 64.

[12] *Id.* at 54-55.

[13] *Id.* at 41.

## CERTIFICATE OF SERVICE

I hereby certify that on this 5th day of October, 2012, I caused to be electronically filed a

true and correct copy of ***Plaintiffs' Brief Pursuant to Court Order of September 21, 2012***, with

the Clerk of the U.S. District Court of the Northern District of Illinois, Eastern Division, 219

South Dearborn Street, Chicago, Illinois, using CM/ECF, which will send electronic notification

of such filing to the following:

Margo Ely
City of Naperville
400 S. Eagle Street
Naperville, Illinois 60540
ElyM@naperville.il.us

Kristen June Foley
City of Naperville
400 S. Eagle Street
Naperville, Illinois 60540
FoleyK@naperville.il.us

By: _s/ Doug E. Ibendahl_____
Doug E. Ibendahl, ARDC No.: 6229474
165 N. Canal Street, Suite 1215
Chicago, Illinois 60606-1404
Tel: 312-648-0061
Email: dibendahl@mail.com
ATTORNEY FOR PLAINTIFFS