**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| NAPERVILLE SMART METER AWARENESS, an Illinois not-for-profit Corporation, MARGARET MARY WOOD, SCOTT J. DERENGOWSKI, KIMBERLEY ELLS HAMILTON, JO MALIK, JENNIFER STAHL, TOM GLASS, KIM BENDIS, GLENN A. MENDOZA, and AMANDA RYKOV, | ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | 11 C 9299 |
| v. | ) ) ) | Judge John Z. Lee |
| CITY OF NAPERVILLE, | ) ) ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Naperville Smart Meter Awareness ("NSMA"), an Illinois not-for-profit corporation, and several of its members have sued the City of Naperville ("the City") pursuant to 42 U.S.C. § 1983 for violating federal rights under the Public Utility Regulatory Policies Act of 1978 ("PURPA"), 16 U.S.C. §§ 2601-45, as amended by the Energy Policy Act of 2005, 16 U.S.C. § 2621(d)(14)(A) and (C) (Count I), as well as their rights to due process and liberty in bodily integrity under the Fourteenth Amendment (Count II), to be free from unreasonable search under the Fourth Amendment (Count III), and to be free from government takings under the Fifth Amendment (Count IV). Plaintiffs move for a preliminary injunction. For its part, Defendant has moved to dismiss the complaint pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(1) and 12(b)(6). For the reasons set forth in this Memorandum Opinion and Order, the Court grants the motion to dismiss and denies the motion for preliminary injunction as moot.

**<u>Facts</u>**[1]

This case is about smart meters. A smart meter is a device that has the ability to collect aggregate, as well as detailed, measurements of a customer's electrical power usage and to communicate those measurements via wireless radio frequency ("RF") to the electric utility provider. (1st Am. Compl. ¶ 39.) The measurements are sent via RF waves from a customer's meter to a wireless repeater that is typically located on a nearby utility pole. (*Id.* ¶ 40.) The measurements are then relayed to the utility provider via a series of wireless repeaters. (*Id.*) Installation of a smart meter obviates the need for a meter reader to visit the customer's house or business. (*Id.*) Smart meters support two-way communication between the customer and utility provider, which permits the utility provider to upgrade a customer's smart meter with future innovations easily. (*Id.*) While analog meters provide data regarding total consumption of electricity that typically is collected on a monthly basis, smart meters permit remote measurements on a daily or more frequent basis. (*Id.* ¶ 139.)

NSMA is a corporation that was formed to educate, engage, and empower families, friends, and neighbors to advocate for a fiscally responsible and safe utility meter alternative in Naperville, Illinois. (*Id.* ¶ 9.) All NSMA members, including Plaintiffs, reside in Naperville, purchase electric utility service from Defendant's Department of Public Utilities, and have been required to have a smart meter installed at their home or business. (*Id.*) Electricity for all residential and commercial consumers within the incorporated city limits of Naperville, Illinois, is supplied by the City's Department of Public Utilities-Electric, a utility entirely owned and operated by the City. (*Id.* ¶ 21.)

---

[1] Unless otherwise noted, the facts are taken from the First Amended Complaint and attachments thereto.

Smart meters are now becoming more prevalent, at least in Naperville, because the American Recovery and Reinvestment Act of 2009 provided the U.S. Department of Energy ("DOE") with approximately $4.5 billion in federal funding to modernize the nation's electric power grid. (*Id.* ¶ 24.) Of that amount, $3.4 billion was allocated to the Smart Grid Investment Grant Program for the purpose of funding competitively selected projects including Naperville's Smart Grid Initiative ("NSGI"). (*Id.*)

In April 2010, Naperville's City Counsel, after a vote, executed a grant agreement with the DOE ("DOE Agreement"), whereby Naperville and the DOE each provide $10,994,110.00 towards the $22 million investment in the NSGI. (*Id.* ¶ 26.) The grant agreement provides for the full-scale installation of smart meters in all homes in Naperville by April 2014. (*Id.* ¶¶ 27, 29, 31.) Plaintiffs allege that Naperville provided no notice and conducted no public proceedings prior to its consideration and approval of the NSGI. (*Id.* ¶ 121.)

NSGI has three primary goals. First, NSGI accelerates the modernization of Naperville's electric transmission, distribution, and delivery systems and promotes investment in smart grid technologies that increase flexibility, functionality, interoperability, cyber security, situational awareness, and operational efficiency. (*Id.*, Ex. A., DOE Agreement, Attachment E, Statement of Project Objectives, ¶ A.) Second, NSGI reduces emissions, lowers costs, increases reliability, and offers greater security and flexibility to accommodate new energy technologies, including renewable, intermittent and distributed sources. (*Id.*) Third, NSGI collects information from customers, distributors, and generators in order to understand how smart grid technology may lead to reductions in demands and costs, as well as increases in energy efficiency, and optimal allocation and match of resources to meet that demand, and increases in the reliability of the grid. (*Id.*)

The DOE Agreement provides that Naperville "will provide customer-level data in a mutually agreed upon format and media to DOE, or an entity designated by DOE (*e.g.*, a national laboratory)." (*Id.*, Attach. B, Federal Assistance Reporting Checklist and Instructions, ¶ C.2.) The DOE Agreement specifies, however, that "[t]he identity of specific customers shall not be included with the data. To protect customer confidentiality, masked customer identifiers shall be provided for individual customers." (*Id.*) With regard to commercially valuable Smart Grid technical data and information, Naperville is required to provide the following designation on any such data: "Unless compelled by a court of competent jurisdiction, there may be no public release of this data to the public without written consent of the Recipient [Naperville] and DOE. Aggregate data that does not identify company-specific impact metric information may be released as set forth in the grant." (*Id.*, Attach. C, Intellectual Property Provisions Nonresearch and Development, ¶ b.)

On February 15, 2011, the City adopted the Naperville Smart Grid Customer Bill of Rights. (*Id.* ¶ 50 (citing http://www.naperville.il.us/emplibrary/Smart_Grd/NSGI-CBoR-web.pdf).) The bill of rights states that "[p]ersonal information will not be connected to usage data released to any third parties" and "[d]isclosure of energy usage data to any third party, such as in the case of a court order, is subject to federal, state and local laws." (*Id.*) The bill of rights provides each customer the right to file a privacy violation complaint with the Public Utilities Advisory Board ("PUAB"), an entity that serves in an advisory capacity to the City Council, City Manager, and the Public Utilities Director in matters relating to rates, budgets, and capital improvements for the electric system. (*Id.* ¶ 52.) The PUAB consists of one Council member and five residents or persons with their primary employment in Naperville. (*Id.* ¶ 23.)

On October 4, 2011, the City Council adopted Ordinance 11-144 that allows for a non-wireless meter alternative ("NWMA") option. (*Id.* ¶ 84.) Plaintiffs allege that an NWMA is not a true opt-out option because even customers who choose an NWMA must have a smart meter installed, albeit with the radio frequency ("RF") transmitter turned off. (*Id.* ¶¶ 154-55.) Such smart meters still collect the same data, but that data is not transmitted wirelessly to the utility throughout the day. (*Id.*) Any customer requesting the NWMA option will be subject to a one-time charge of $68.35 and an additional monthly charge that has not yet been specified. (*Id.* ¶ 85.)

On November 15, 2011, Naperville citizens (aided by NSMA) filed a petition with 4,209 signatures in order to place the following question on the March 20, 2012, General Primary Election ballot within the City: "Shall the City of Naperville immediately and permanently stop the implementation of the $22 million smart meter project and dismantle all related equipment?" ("Advisory Referendum") (*Id.* ¶ 67.) Plaintiffs allege that the City recruited an objector to the Advisory Referendum, who filed an objection on December 27, 2011. (*Id.* ¶ 70.) On January 12, 2012, the City's Municipal Officers Electoral Board (comprised of the Mayor, the City Clerk and one member of the City Council) ruled that the Advisory Referendum was ineligible for the ballot. (*Id.* ¶ 71.) On January 24, 2012, the Circuit Court of DuPage County upheld the Electoral Board's ruling, and an appeal was filed. (*Id.* ¶¶ 73, 75.) On March 6, 2012, the Illinois Appellate Court dismissed the appeal as moot because the absentee ballots could not be accommodated to reflect the Advisory Referendum. (*Id.* ¶ 78.)

On January 4, 2012, Naperville began installing smart meters in customers' homes. (*Id.* ¶ 87.) Plaintiffs allege that the commencement of the installation has deprived Plaintiffs of the opportunity to weigh their options and alternatives. (*Id.* ¶ 87.)

5

Plaintiffs are concerned that the RF waves utilized by smart meter technology present a health concern to such a degree that it violates their Fourteenth Amendment right to liberty in bodily integrity. (*Id.* ¶ 131.) In January 2011, during an interview with *The New York Times*, California State Representative Jared Huffman stated, in pertinent part, "Whether or not you believe RF exposures from smart meters are harmful, it's only fair that consumers who are concerned about health effects be given complete technical information and the choice of another technology for devices that are installed at their homes." (*Id.* ¶ 42.) Plaintiffs allege that "[t]he California Council on Science and Technology ('CCST') stated in their report released in April, 2011, 'that no additional standards are needed to protect the public from smart meters.' However, CCST also stated: 'Not enough is currently known about potential non-thermal impacts of radio frequency emissions to identify or recommend additional standards for such impacts. . . . It is not scientifically confirmed whether or what the non-thermal effects on living organisms, and potentially, human health might be." (*Id.* ¶ 43.)

Finally, Plaintiffs allege that the City's installation of smart meters is an unconstitutional taking because customers suffer a permanent occupation of their homes by Defendant's smart meters. (*Id.* ¶ 148.) Plaintiffs also allege that, in certain instances, the City has demanded the removal of plants, landscaping, and other property to accommodate the installation of smart meters. (*Id.* ¶ 157.)

Plaintiffs seek to enjoin Defendant from installing smart meters until reasonable safeguards are in place and until satisfactory alternative options for all customers are made available. (*Id.* ¶ 3.)

### Discussion

I. **Subject Matter Jurisdiction as to NSMA's Claims and Count IV**

    A.     **NSMA Satisfies the Requirements of Associational Standing**

As an initial matter, Defendant moves to dismiss the First Amended Complaint as to Plaintiff

NSMA for lack of subject matter jurisdiction, arguing that NSMA lacks standing to bring this case

on behalf of its members. With regard to this facial attack on jurisdiction, the "allegations are taken

as true and construed in a light most favorable to the complainant." *Cedars-Sinai Med. Ctr. v.*

*Watkins*, 11 F.3d 1573, 1583 (Fed. Cir. 1993). To obtain associational standing, an organization

must satisfy the three-prong test of *Hunt v. Washington State Apple Advertising Commission*:

> [A]n association has standing to bring suit on behalf of its members
> when: (a) its members would otherwise have standing to sue in their
> own right; (b) the interests it seeks to protect are germane to the
> organization's purpose; and (c) neither the claim asserted nor the
> relief requested requires the participation of individual members in
> the lawsuit.

432 U.S. 333, 343 (1977). Thus, "[t]he standing of an organization is derivative of its members'

standing . . . ." *Rockford League of Women Voters v. U.S. Nuclear Regulatory Comm'n*, 679 F.2d

1218, 1221 (7th Cir. 1982).

Defendant does not argue that NSMA members do not have standing to sue in their own right

for the constitutional violations alleged herein. Nor does Defendant contend that the interests NSMA

seeks to protect are not germane to its purpose, or that the claim or relief requested requires the

participation of individual members in the lawsuit. Simply put, NSMA's allegations satisfy the

three-prong test for associational standing. First, the individual members' federal claims are not so

"completely devoid of merit as not to involve a federal controversy." *See Owasso Indep. Sch. Dist.*

*No. I-011 v. Falvo*, 534 U.S. 426, 431 (2002) (holding that, when it is an open question whether a federal statute provides private parties with a cause of action enforceable under section 1983, there is a sufficient controversy to support jurisdiction). Second, the interests NSMA seeks to protect are germane to the organization's purpose of "empower[ing] families, friends and neighbors to advocate for a fiscally responsible and safe utility meter solution in Naperville, Illinois." (1st Am. Compl. ¶ 9.) Third, although some of the individual NSMA members are Plaintiffs in this case, neither the claims asserted nor the injunctive relief requested requires their participation in this lawsuit. (*Id.* ¶¶ 115-59; *id.*, Prayer for Relief.)

Instead, Defendant relies on *N.A.A.C.P. v. Alabama*, 357 U.S. 449, 458-60 (1958), and argues that NSMA has failed to establish associational standing because it has not alleged that smart meter installation adversely affects its members' associational ties to NSMA. In that case, the Supreme Court held that the N.A.A.C.P. had standing to assert the constitutional rights of its members in resisting the production of the organization's membership lists. *Id.* at 459. In reaching this decision, the Court found that the interests of the association and its members were identical because the association was created to express its members' views more effectively. *Id.* The Court also noted that if production of the association's membership list were compelled, it would be reasonably likely that the association would lose membership and financial support. *Id.* at 459-60.

As in *N.A.A.C.P.*, this Court holds that NSMA has standing to assert the constitutional rights of its members in resisting the installation of smart meters because the association was created to advocate its members' views on this matter. (1st Am. Compl. ¶ 9.) Furthermore, if it is determined by a court that installation of smart meters is constitutionally permissible, it is reasonably likely that NSMA would lose membership because one of NSMA's primary goals of challenging the

constitutionality of the smart meters will have been thwarted. Thus, the Court holds that NSMA has standing to sue on behalf of its members.

### B. The Court Lacks Jurisdiction As to the Takings Claim

Defendant also argues that this Court lacks jurisdiction with respect to Plaintiffs' claim that Defendant violated the Fourteenth Amendment of the U.S. Constitution through a violation of the Fifth Amendment's Takings Clause because the claim is unripe. As part of this claim, Plaintiffs allege that they suffer a permanent occupation of their homes by Defendant's smart meters and a loss of property without compensation in instances where Defendant demanded the removal of plants, landscaping, and other property to accommodate the installation of smart meters. (1st Am. Compl. ¶¶ 148, 157.)

The Takings Clause states: "nor shall private property be taken for public use, without just compensation." U.S. Const. amend. V. In *Williamson County Regional Planning Commission v. Hamilton Bank of Johnson City*, 473 U.S. 172, 186 (1985), the Supreme Court established a two-pronged ripeness test applicable to federal takings claims. Under *Williamson County*, a takings claim is not ripe until "(1) the regulatory agency has had an opportunity to make a considered definitive decision, *and* (2) the property owner exhausts available state remedies for compensation." *Forseth v. Vill. of Sussex*, 199 F.3d 363, 368 (7th Cir. 2000) (emphasis added); *see Williamson County*, 473 U.S. at 186. However, a plaintiff may be excused from the exhaustion requirement if he demonstrates that "the inverse condemnation procedure is unavailable or inadequate." *Williamson County*, 473 U.S. at 197. "[W]hen considering a motion that launches a factual attack against jurisdiction, the district court may properly look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact

subject matter jurisdiction exists." *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 444 (7th Cir. 2009) (quotation and alterations omitted).

Plaintiffs have failed to establish that they have exhausted available state remedies for compensation or that any attempt to exhaust such remedies would have been futile. Plaintiffs outright concede that they have not exhausted their available administrative remedies for compensation. (Pls.' Br. Pursuant Ct. Order 9/21/12 at 12-13.) However, Plaintiffs argue that any attempt to raise the takings claim with Defendant's City Council would have been futile because the City Council is the entity that authorized the smart grid project in the first place. Even if the Court were to assume that this were true, Plaintiffs fail to explain why they did not avail themselves of the other available state law remedies, such as a lawsuit for damages, an injunction, or declaratory relief based on the Illinois Constitution, the inverse condemnation statute, or Illinois common law. "Illinois provides ample process for a person seeking just compensation." *Muscarello v. Ogle Cnty. Bd. of Comm'rs*, 610 F.3d 416, 422 (7th Cir. 2010); *see* Ill. Const. art. I, sec. 15 (prohibiting a taking or a damage to private property for public use without just compensation); 735 Ill. Comp. Stat. 30/10-5-5 (creating statutory inverse condemnation where private property is taken for public use without just compensation); *Zeitz v. Vill. of Glenview*, 710 N.E.2d 849, 851-52 (Ill. App. Ct. 1999) (noting that damages, as well as declaratory and injunctive relief, are available in cases alleging inverse condemnation and improper taking); *Patzner v. Baise*, 552 N.E.2d 714, 717 (Ill. 1990) (stating a remedy is available in the Illinois Court of Claims against a public authority for damaged property); *LaSalle Nat'l Bank & Tr. Co. v. City of Chi.*, 470 N.E.2d 1239 (Ill App. Ct. 1984) (recognizing that injunction is a proper remedy when an unlawful appropriation of land is attempted for use by a public corporation which has not acquired this right by condemnation or otherwise).

Because Plaintiffs were given an opportunity to, but did not, show that they have exhausted all of their state law remedies or that resort to all such available remedies would have been futile, the Court holds that Plaintiffs' § 1983 takings claim is unripe. The Court grants Defendant's motion to dismiss Count IV, which is dismissed without prejudice.

## II. Defendant's Motion To Dismiss for Failure To State a Claim

Next, Defendant moves to dismiss the first amended complaint for failure to state a claim. For the purposes of a Rule 12(b)(6) motion to dismiss, "a court must accept as true all of the allegations contained in the complaint." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To survive a motion to dismiss, a complaint must contain sufficient factual matter to "'state a claim to relief that is plausible on its face.'" *Id.* at 663 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Factual allegations must be sufficient to raise a right to relief above the speculative level. *Twombly*, 550 U.S. at 555.

Section 1983 provides a federal remedy for "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. This includes the deprivation of "federal statutory as well as constitutional rights." *Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103, 105 (1989).

> A determination that § 1983 is available to remedy a statutory or constitutional violation involves a two-step inquiry. First, the plaintiff must assert the violation of a federal right. Section 1983 speaks in terms of "rights, privileges, or immunities," not violations of federal law. In deciding whether a federal right has been violated, we have considered whether the provision in question creates obligations binding on the governmental unit or rather "does no more than express a congressional preference for certain kinds of treatment." The interest the plaintiff asserts must not be "too vague and amorphous" to be "beyond the competence of the judiciary to enforce." We have also asked whether the provision in question was "intend[ed] to benefit" the putative plaintiff.

11

*Id.* at 106 (citations omitted).

### A. Counts I & II: Plaintiffs' § 1983 Claim Based on the Public Utility Regulatory Policies Act

In support of Counts I and II, Plaintiffs allege that the Public Utility Regulatory Policies Act of 1978 ("PURPA"), Pub. L. No. 95-617, 92 Stat. 3117 (codified at 16 U.S.C. §§ 2601-45), as amended by the Energy Policy Act of 2005, Pub. L. No. 109-58, 119 Stat. 594 (codified as amended in various sections of the U.S.C.), creates a federal right. "In order to seek redress through § 1983, . . . a plaintiff must assert the violation of a federal *right*, not merely a violation of federal *law*." *Blessing v. Freestone*, 520 U.S. 329, 340 (1997). "A court's role in discerning whether personal rights exist in the § 1983 context should . . . not differ from its role in discerning whether personal rights exist in the implied right of action context." *Gonzaga v. Doe*, 536 U.S. 273, 285 (2002).

> We have traditionally looked at three factors when determining whether a particular statutory provision gives rise to a federal right. First, Congress must have intended that the particular statutory provision benefit the plaintiff. Second, the plaintiff must demonstrate that the right assertedly protected by the statute is not so "vague and amorphous" that its enforcement would strain judicial competence. Third, the statute must unambiguously impose a binding obligation on the States. In other words, the provision giving rise to the asserted right must be couched in mandatory, rather than precatory, terms.

*Blessing*, 520 U.S. at 340-41.

"[W]here the text and structure of a statute provide no indication that Congress intends to create new individual rights, there is no basis for a private right suit, whether under § 1983 or under an implied right of action." *Gonzaga*, 536 U.S. at 286. "Once a plaintiff demonstrates that a statute confers an individual right, the right is presumptively enforceable by § 1983." *Id.* at 284. Defendant may rebut the presumption by showing that Congress "specifically foreclosed a remedy under §

1983." *Id.* at 285 n.4 (quotation omitted). "Congress may do so expressly, by forbidding recourse to § 1983 in the statute itself, or impliedly, by creating a comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983." *Blessing*, 520 U.S. at 341.

PURPA was enacted by Congress to respond "to the energy crisis of the 1970s" and "to lessen the dependence of electric utilities on fossil fuels by encouraging the development of alternative power sources." *N. Am. Natural Res., Inc. v. Strand*, 252 F.3d 808, 809 (6th Cir. 2001). Congress enacted the Energy Policy Act of 2005 "to ensure jobs for our future with secure, affordable, and reliable energy" by expanding the nation's interstate electric grid. Energy Policy Act of 2005, Pub. L. No. 109-58, 119 Stat. 594; Drew Thornley, *The Federal Government's Authority To Site Interstate Electric Transmission Lines: How The Meaning of "Withheld" Is Withholding Clarity for Transmission Development*, 6 Tex. J. Oil, Gas, & Energy L. 385, 396 (2010-11).

Here, Plaintiffs allege that 16 U.S.C. §§ 2621(d)(14)(A) and (C) and 2631 create a federal right. § 2621(d)(14)(A) provides:

> Not later than 18 months after August 8, 2005, each electric utility shall offer each of its customer classes, and provide individual customers upon customer request, a time-based rate schedule under which the rate charged by the electric utility varies during different time periods and reflects the variance, if any, in the utility's costs of generating and purchasing electricity at the wholesale level. The time-based rate schedule shall enable the electric consumer to manage energy use and cost through advanced metering and communications technology.

In turn, § 2621(d)(14)(C) provides: "Each electric utility subject to subparagraph (A) shall provide each customer requesting a time-based rate with a time-based meter capable of enabling the utility and customer to offer and receive such rate, respectively." However, PURPA adds that "each State regulatory authority shall . . . issue a decision whether it is appropriate to implement the standards set

13

out in subparagraphs (A) and (C)." § 2621(d)(14)(F).

Given that Congress explicitly granted discretion to the state regulatory authority to implement § 2621(d)(14)(A) and (C), these statutory provisions fail to create obligations binding on Naperville and does not create a private right of action for the Plaintiffs in this case. These statutory provisions do no more than express Congress' intent that the State regulatory authority consider the suggested standards. Thus, because the Court holds § 2621(d)(14)(A) and (C) are not couched in mandatory terms, they fail to create a federal right upon which a § 1983 claim can be based.

Although not raised by Plaintiffs, § 2631(a) of PURPA does provide a cause of action under certain circumstances. But they are not applicable here. The statute states:

> In order to initiate and participate in the consideration of one or more of the standards established by subchapter II or other concepts which contribute to the achievement of the purposes of this chapter, . . . any electric consumer of an affected electric utility may intervene and participate as a matter of right in any ratemaking proceeding or other appropriate regulatory proceeding relating to rates or rate design which is conducted by a State regulatory authority . . . or by a nonregulated electric utility.

However, the statute later states:

> Notwithstanding any other provision of law, no court of the United States shall have jurisdiction over any action arising under any provision of subchapter I or II or of this subchapter except for . . . (1) an action over which a court of the United States has jurisdiction under subsection (b) or (c) (2) of this section; and (2) review of any action in the Supreme Court of the United States in accordance with sections 1257 and 1258 of Title 28.

16 U.S.C. § 2633(a).

Because Plaintiffs' claim falls within subchapter II, *see* Ch. 46-Public Utility Regulatory Policies (table indicating that § 2621 is within Subchapter II), this Court lacks jurisdiction over such

14

a claim unless it fits within one of the enumerated exceptions. The Court addresses each exception below.

Turning first to subsection (b), subsection (b)(1) allows the Secretary to bring an action in "any appropriate court of the United States to enforce his right to intervene." § 2633(b)(1). Because Plaintiffs are not the Secretary, § 2633(b)(1) does not apply.

Second, subsection (b)(2) provides that:

> If any electric utility or electric consumer having a right to intervene under *section 2631(a)* of this title is denied such right by any State court, such electric utility or electric consumer may bring an action in the appropriate United States district court to require the State regulatory authority or nonregulated electric utility to permit such intervention and participation, and such court shall have jurisdiction to grant appropriate relief.

§ 2633(b)(2) (emphasis added). Although Plaintiffs could have sought to intervene in any proceeding that they thought was occurring behind closed doors and could have then sought relief in state court to review any such denial, Plaintiffs concede that they did not do so. (*See* 1st Am. Compl. ¶¶ 121-22.) Because no state court has ever denied Plaintiffs the right to intervene under § 2631(a), § 2633(b)(2) does not apply.

As to subsection (c), subsection (c)(2) provides that:

> Any person (including the Secretary) may obtain review in the appropriate court of the United States of any determination made under subchapter I or II or this subchapter by a Federal agency if such person (or the Secretary) intervened or otherwise participated in the original proceeding or if otherwise applicable law permits such review. Such court shall have jurisdiction to grant appropriate relief. Any person (including the Secretary) may bring an action to enforce the requirements of subchapter I or II or this subchapter with respect to any Federal agency in the appropriate court of the United States and such court shall have jurisdiction to grant appropriate relief.

15

§ 2633(c)(2). Because this case does not involve any determination by a federal agency, § 2633(c)(2) does not apply.

Lastly, § 2633(a)(2) provides that federal courts have jurisdiction to "review of any action in the Supreme Court of the United States in accordance with sections 1257 and 1258 of Title 28." That exception is also inapplicable.

Because § 2633(c)(2) expressly bars Plaintiffs' PURPA claims from federal court and its exceptions do not apply, the Court holds that Congress did not intend to create a federal right that benefits Plaintiffs in this case via these statutory provisions. Accordingly, the Court grants Defendant's motion to dismiss Plaintiffs' § 1983 claim based on PURPA, and this claim is dismissed with prejudice.

### B. Count II: Plaintiffs' § 1983 Due Process Claim Based on Liberty Interests in Bodily Integrity

In Count II, Plaintiffs contend that Defendant violated their right to due process based on their liberty interest in bodily integrity and self-determination arising from the Due Process Clause itself. Specifically, Plaintiffs allege that the Defendant did not provide its citizens with notice and an opportunity to be heard before forcing the installation of smart meters in their homes that purportedly expose citizens to harmful RF waves.

"The Fourteenth Amendment prevents the state from depriving any person of liberty or property without due process of law." *Eichman v. Ind. State Univ. Bd. of Trs.*, 597 F.2d 1104, 1109 (7th Cir. 1979). "[T]here can be no claim of a denial of due process, either substantive or procedural, absent deprivation of either a liberty or a property right." *Id.* On a motion to dismiss, "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly,*

550 U.S. at 555. "[T]he pleading must contain something more . . . than . . . a statement of facts that merely creates a suspicion [of] a legally cognizable right of action." *Id.* (citation and quotation omitted). For these reasons, courts need not accept "unreasonable inferences or unwarranted deductions of fact." *Mid-America Reg'l Bargaining Ass'n v. Will Cnty. Carpenters Dist. Council,* 675 F.2d 881, 883 (7th Cir. 1982) (quotation omitted). Plaintiffs' allegations in Count II do not satisfy *Twombly.*

As an initial matter, the Court notes that Plaintiffs themselves have acknowledged that Defendant offers the option of installing a smart meter with a disabled radio transmitter. (1st Am. Compl. ¶¶ 154-55.) Thus, it is within Plaintiffs' control whether radio frequencies are emitted from the smart meter installed in their home. Plaintiffs' concern that Defendant would leave radio transmitters active in blatant disregard of Plaintiffs' requests that they be turned off is pure speculation and requires an unreasonable inference. This alone provides a basis to grant Defendant's motion to dismiss Count II of Plaintiffs' First Amended Complaint.

Assuming, *arguendo,* however, that there were no option of deactivating the radio transmitter in smart meters, this claim nevertheless would not survive a motion to dismiss. Plaintiffs allege that "[i]n January of 2011, during an interview with *The New York Times,* California State Representative Jared Huffman stated, in pertinent part, 'Whether or not you believe RF [radio frequency] exposures from smart meters are harmful, it's only fair that consumers who are concerned about health effects be given complete technical information and the choice of another technology for devices that are installed at their homes." (*Id.* ¶ 42.) Plaintiffs also allege:

> The California Council on Science and Technology ("CCST") stated in their report released in April, 2011, "that no additional standards are needed to protect the public from smart meters." However, CCST also stated: "Not enough is currently known about potential non-thermal impacts of radio frequency emissions to identify or

17

recommend additional standards for such impacts. . . . It is not scientifically confirmed whether or what the non-thermal effects on living organisms, and potentially, human health might be."

(*Id.* ¶ 43.)

It is abundantly clear that Plaintiffs' due process claim is premised upon a theory that the radio waves emitted from the smart meters, together with other RF-wave-emitting devices in the environment, have the potential to be harmful. Plaintiffs allege that certain doctors believe that over time the public's cumulative exposure to low-level RF from devices such as cell phones, radio towers, and smart meters may pose health risks, such that more accurate guidelines and standards regarding the safety of RF exposure are necessary. However, Plaintiffs do not allege that Defendant's smart meters, in and of themselves, deprive any particular plaintiff in this case of a liberty interest in bodily integrity or self-determination. Indeed, nowhere do Plaintiffs actually allege that smart meters are causing harm to residents or that they would do so. The bare allegation that it is unknown whether Plaintiffs are actually being harmed by the level of RF waves emitted from one smart meter is insufficient to satisfy *Twombly*. Accordingly, the Court grants Defendant's motion to dismiss and dismisses Plaintiffs' due process claim based on a deprivation of their liberty interest in bodily integrity and self-determination without prejudice.

### C.    Count III:  Plaintiffs' § 1983 Claim Based on Unreasonable Search under the Fourth Amendment

The Fourth Amendment guarantees that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. But "[w]hat a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." *Katz v. United States,*

18

389 U.S. 347, 351 (1967). The Supreme Court "uniformly has held that the application of the Fourth Amendment depends on whether the person invoking its protection can claim a justifiable, a reasonable, or a legitimate expectation of privacy that has been invaded by government action." *Smith v. Maryland*, 442 U.S. 735, 740 (1979) (quotations omitted).

> This inquiry . . . normally embraces two discrete questions. The first is whether the individual, by his conduct, has exhibited an actual (subjective) expectation of privacy – whether . . . the individual has shown that he seeks to preserve [something] as private. The second question is whether the individual's subjective expectation of privacy is one that society is prepared to recognize as reasonable – whether . . . the individual's expectation, viewed objectively, is justifiable under the circumstances.

*Id.* (citations and quotations omitted). "[A] person has no legitimate expectation of privacy in information he voluntarily turns over to third parties" because he "'assume[s] the risk" of disclosure'." *See id.* at 743-44; *see United States v. Flores-Lopez*, 670 F.3d 803, 807 (7th Cir. 2012) ("[B]y subscribing to the telephone service the user of the phone is deemed to surrender any privacy interest he may have had in his phone number."). "[N]o Fourth . . . Amendment claim can prevail where . . . there exists no legitimate expectation of privacy . . . ." *Couch v. United States*, 409 U.S. 322, 335 (1973).

Naperville provides electricity service to Plaintiffs, which necessarily involves measuring their electricity usage for billing purposes.[2] Plaintiffs do not, and cannot, contend that they have a

---

2 The Municipal Code of Naperville, Illinois provides: "All energy supplied to a customer shall be metered, except when the consumption is temporary and authorized in writing by the City Manager. All meters shall be supplied by the Department of Public Utilities to its customers and the City shall hold title to such meters. The Department of Public Utilities shall maintain all meters or replace same if beyond repair at no expense to the customer. Electric meters shall be under the control and supervision of the Department of Public Utilities and may be exchanged or removed at any time for testing." Naperville Municipal Code 8-1A-4. By receiving electric service and power from Defendant, Plaintiffs agree to:

> conform to and abide by all the ordinances, rules and regulations of the City, as now in force or hereafter altered or amended, pertaining to the design, approval, installation, inspection and acceptance of on-site electrical

subjective expectation of privacy in the aggregate measurements of their electricity use. Indeed, Plaintiffs do not argue that Defendant violated their constitutional rights when it sent meter readers to their homes over these many years to read their analog meters. That smart meters enable Defendant to read the aggregate measurements remotely and more frequently does not permit Plaintiffs to re-capture their already-surrendered privacy interest in the aggregate measurement of their electricity usage (whether that aggregate usage is measured monthly, weekly, daily, hourly, or in fifteen-minute increments).

In this way, the Supreme Court's decision in *Smith v. Maryland*, 442 U.S. 735, 742 (1979), is instructive. In that case, the Court held that by subscribing to the telephone service, the user of the phone is deemed to surrender any legitimate privacy interest he may have had in his phone number. (*Id.*) Other cases, relying on *Smith*, have similarly held that by subscribing to electricity service, the electricity user is deemed to surrender any privacy interest in the electricity usage records for the user's residence. *United States v. McIntyre*, 636 F.3d 1107, 1111 (8th Cir. 2011); *United States v. Porco*, 842 F. Supp. 1393, 1398 (D. Wyo. 1994).

Plaintiffs attempt to distinguish *Smith* and its progeny by arguing that in those cases, the information at issue was conveyed to third parties whereas, here, Defendant is not a third party. This reasoning is unpersuasive. Plaintiffs have knowingly conveyed the aggregate measurements of their electricity usage directly to the party from which they wish to keep it a secret. Their expectation of

---

distribution facilities, the government and regulation of electrical energy customers, the standards of installation and maintenance of service drops, electric wiring, apparatus, appliances and fixtures in the premises served, and the payment for electric service supplied the customer in accordance with such rate schedule as may be in effect from time to time.

*Id.* 8-1A-2.

privacy, to the extent any exists, is certainly less than those of the proponents in *Smith* and the cases that follow.

In addition, Plaintiffs allege that a smart meter has the capability of capturing extremely detailed information about their electricity usage above and beyond aggregate measurements, such as remote daily tracking of time patterns and power loads associated with a customer's power usage. (1st Am. Compl. ¶ 139.) From this data, Plaintiffs fear Defendant can ascertain many personal details of an individual's private life. Plaintiffs argue that because a smart meter technically has such capabilities, it is reasonable to infer that such detailed information is currently being measured and collected by Defendant. The Court disagrees.

Even assuming that a smart meter is technically able to measure electrical usage and load to such minute detail and one were able to ascertain personal details about a resident's life from such data, the mere existence of such a capability does not reasonably lead to an inference that it is actually being employed. For instance, traditional analog meter readers have the ability to observe whether a resident's air conditioning unit is running or whether lights are shining through the resident's windows. That such individuals have the capability of ascertaining such details about one's electrical use does not lead to a reasonable inference that they then relay the information to Defendant. Similarly, that smart meters are capable of measuring such detailed information does not lead to a reasonable inference that such information is being relayed to Defendant or that Defendant would collect such information without Plaintiffs' consent. In fact, Plaintiffs have not alleged that the installed smart meters are presently relaying any such detailed, nonaggregate information about their electricity usage to the City or that the Defendant's capture of such information is imminent. Absent such an allegation, Plaintiffs' assertions do not support a reasonable inference that the type of

nonaggregate information purportedly capable of being collected by smart meters is actually being captured by Defendant in this case.

The Court finds Plaintiffs' reliance on *Kyllo v. United States*, 533 U.S. 27 (2001), and *United States v. Jones*, 132 S. Ct. 945 (2012), unavailing. In *Kyllo* and *Jones*, the criminal defendants did not consent to the government's monitoring of the heat emanating from Kyllo's home or movement in the position of Jones' wife's Jeep. *Kyllo*, 533 U.S. at 33 (distinguishing *Smith*, 442 U.S. at 743-44); *Jones*, 132 S. Ct. at 952 (distinguishing *United States v. Knotts*, 460 U.S. 276, 278 (1983), and *United States v. Karo*, 468 U.S. 705, 712 (1984), in which the criminal defendants consented to the presence of a container with a beeper that enabled government to monitor the container's location). It is the consent, not the nature of the technology being used, that distinguishes this case from *Kyllo* and *Jones*.

Furthermore, precautions are in place to prevent the unwarranted disclosure of Plaintiffs' measurements of electricity usage without their consent. The Illinois Electric Service Customer Choice and Rate Relief Law of 1997 ("Electric Service Customer Act"), as amended, provides that "no specific billing, usage or load shape data shall be provided . . . unless authorization to provide that information is provided by the customer." 220 Ill. Comp. Stat. 5/16-122(b), (c). In addition, each public utility using Smart Grid technology is required by law to have a Smart Grid Advanced Metering Infrastructure Deployment Plan ("AMI Plan") that "secure[s] the privacy of the customer's personal information." 22 Ill. Comp. Stat. 5/16-108.6(d). "'Personal information' for this purpose consists of the customer's name, address, telephone number, and other personally identifying information, as well as information about the customer's electric usage." *Id.* "Electric utilities, their contractors or agents, and any third party who comes into possession of such personal information by

22

virtue of working on Smart Grid technology shall not disclose such personal information to be used in mailing lists or to be used for other commercial purposes not reasonably related to the conduct of the utility's business." *Id.*

Plaintiffs have no reasonable expectation of privacy in the aggregate measurements of their electricity usage because they have consented to such aggregate measurements and they have not alleged that Defendant is currently collecting more detailed information about their electricity usage beyond the aggregate measurements without their consent. Therefore, the Court grants Defendant's motion to dismiss Plaintiffs' Fourth Amendment claim, as pleaded, without prejudice.

In sum, the Court grants Defendant's motion to dismiss Counts I through III for failure to state a claim. Because the Court has dismissed the complaint, it denies Plaintiffs' motion for a preliminary injunction and motion to supplement the record of the motion for preliminary injunction as moot. *See, e.g., Hanover Ins. Group v. Singles Roofing Co., Inc.*, No. 10 C 611, 2012 WL 2368328, at *2 (N.D. Ill. June 21, 2012).

## Conclusion

For the reasons provided in this Memorandum Opinion and Order, the Court grants the Defendant's motion to dismiss [22] and denies Plaintiffs' motion to supplement the record of the motion for preliminary injunction [39] and motion for preliminary injunction as moot [18]. The Court grants Plaintiffs leave to file a Second Amended Complaint within fourteen days of the date of the entry of this Memorandum Opinion and Order to cure the deficiencies outlined herein as to Counts II through IV. Defendant's pending motion for sanctions under Rule 11 [29] is stricken without prejudice with leave to re-file or amend within ten days after the above deadline.

**SO ORDERED**                    ENTER: *March 22, 2013* .

_____
**JOHN Z. LEE**
**U.S. District Judge**